IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DARLENE VILLANUEVA, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 05-325-JJF |
| | : |
| JO ANNE B. BARNHART, | : |
| Commissioner of Social | : |
| Security, | : |
| | : |
| Defendant. | : |
| | : |
| | : |

Steven L. Butler, Esquire of LAW OFFICE OF GARY LINARDUCCI,
ESQUIRE, New Castle, Delaware.

Attorney for Plaintiff.

Colm F. Connolly, Esquire, United States Attorney, of the OFFICE
OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.
Donna L. Calvert, Esquire, Regional Chief Counsel of the SOCIAL
SECURITY ADMINISTRATION, Philadelphia, Pennsylvania.
David F. Chermol, Esquire, Special Assistant United States
Attorney of the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington,
Delaware.

Attorneys for Defendant.

**MEMORANDUM OPINION**

December 21, 2006

Wilmington, Delaware

Farnan, District Judge.

Presently before the Court is an appeal pursuant to 42
U.S.C. § 405(g) filed by Plaintiff, Darlene Villanueva, seeking
review of the final decision of the Commissioner of the Social
Security Administration denying Plaintiff's application for
disability insurance benefits ("DIB") under Title II of the
Social Security Act (the "Act"), 42 U.S.C. §§ 401-433. Plaintiff
has filed a Motion For Summary Judgment (D.I. 14) requesting the
Court to enter judgment in her favor. In response to Plaintiff's
Motion, Defendant has filed a Cross-Motion For Summary Judgment
(D.I. 16) requesting the Court to affirm the Commissioner's
decision. For the reasons set forth below, Defendant's Motion
For Summary Judgment will be denied, and Plaintiff's Motion For
Summary Judgment will be granted. The decision of the
Commissioner dated April 6, 2004, will be reversed and remanded
for further findings and/or proceedings consistent with this
Memorandum Opinion.

## BACKGROUND

## I. Procedural Background

Plaintiff protectively filed an application for DIB on
December 18, 2002, alleging disability as of February 22, 2002,
due to pain and numbness in her hands and fingers, and pain in
her arms, neck, back, head, and legs. (Tr. 51-53, 66).
Plaintiff's application was denied initially and upon

reconsideration. Plaintiff filed a timely request for an administrative hearing, and the A.L.J. held a hearing on March 10, 2004. (Tr. 358-375). Plaintiff was represented by counsel at the hearing, and a vocational expert testified.

Following the hearing, the A.L.J. issued a decision dated April 6, 2004, denying Plaintiff's claim. (Tr. 14-22). Plaintiff filed an appeal, and the Appeal's Council denied review. (Tr. 4-6). Accordingly, the A.L.J.'s decision became the final decision of the Commissioner. Sims v. Apfel, 530 U.S. 103, 107 (2000).

After completing the process of administrative review, Plaintiff filed the instant civil action pursuant to 42 U.S.C. § 405(g), seeking review of the A.L.J.'s decision denying her claim for DIB. In response to the Complaint, Defendant filed an Answer (D.I. 8) and the Transcript (D.I. 9) of the proceedings at the administrative level.

Thereafter, Plaintiff filed a Motion For Summary Judgment and Opening Brief (D.I. 14, 15) in support of the Motion. In response, Defendant filed a Cross-Motion For Summary Judgment and a combined Opening and Answering Brief (D.I. 16, 17) requesting the Court to affirm the A.L.J.'s decision. Plaintiff waived her right to file a Reply Brief (D.I. 18), and therefore, this matter is fully briefed and ripe for the Court's review.

## II.  Factual Background

A.   Plaintiff's Medical History, Condition and Treatment

At the time the A.L.J. issued his decision, Plaintiff was forty-four years old. (Tr. 54). Plaintiff attended high school until the eleventh grade. Her past relevant work experience included work as a postal clerk. (Tr. 361). Plaintiff currently receives disability retirement benefits from the United States Postal Service (Tr. 362) and lives with her husband and five children ranging in age from six to fifteen years old. (Tr. 118).

On February 22, 2002, Plaintiff was involved in a motor vehicle accident in which she was struck from behind by another car traveling at a speed of 35 miles per hour. Plaintiff was not wearing a seat belt at the time of the collision. Plaintiff was able to get out of the vehicle after the accident, but she was taken for emergency treatment at Silverside Medical Center. Plaintiff was diagnosed with whiplash and a T-6 rib fracture. (Tr. 233). Plaintiff was prescribed Skelaxin as needed for muscle spasms and Darvocet and Motrin for pain. (Tr. 233).

Five days after the accident, Plaintiff reported to John R. Tiffany, M.D. for an examination. Plaintiff had normal range of motion of in her neck and shoulders with no tenderness, spasms, contracture, deformity, mass or misalignment. In her back, Plaintiff had limited right flexion and extension, but no

3

tenderness or spasm. (Tr. 331). Dr. Tiffany diagnosed Plaintiff with a cervical strain, right shoulder strain and a fractured rib. (Tr. 332). Dr. Tiffany prescribed Ultram for Plaintiff's back and shoulder symptoms.

The day before seeing Dr. Tiffany, Plaintiff presented to Matthew J. McIlrath, D.C., a chiropractor, with complaints of headaches, neck pain and mid-back pain. Dr. McIlrath indicated that Plaintiff's prognosis was guarded due to the severity of her injuries. Dr. McIlrath also opined that Plaintiff was likely to be disabled for a period of 6-8 weeks, and could not return to work until her rib fracture was completely healed. (Tr. 172).

Plaintiff treated with Dr. McIlrath from February 26, 2002, through the date of the administrative hearing in this case. Between February 26, 2002 and January 28, 2004, Plaintiff saw Dr. McIlrath 155 times for treatment. On March 18, 2002, Dr. McIlrath wrote to Plaintiff's insurance company stating that she had pain on all ranges of motion and that whatever range of motion she did have was limited. (Tr. 165). Dr. McIlrath indicated that Plaintiff suffered from cerival acceleration/deceleration injury, deep and superficial muscle spasms, post-traumatic rib fracture, and radicular symptomatology localized. Dr. McIlrath described her prognosis as poor and guarded due to the severity of her condition and recommended manipulation and electrical muscle stimulation treatments three

times a week for six weeks. (Tr. 165). Dr. McIlrath also completed a pre-printed "Disability Certificate" indicating that Plaintiff was "totally incapacitated" from February 26, 2002 through April 9, 2002, and reported the same to her attorney. (Tr. 163, 163A).

In April 2002, Plaintiff returned to Dr. Tiffany. (Tr. 327). Upon examination, Dr. Tiffany found that Plaintiff had normal range of motion of her neck and shoulders with no tenderness or spasms. (Tr. 328). Her back range of motion was also normal with no spasms, although she had some mid-line tenderness in her back. (Tr. 325). Dr. Tiffany recommended rest and continued treatment with heat. He also prescribed Vioxx and Flexeril. (Tr. 326).

During some of her May visits to Dr. McIlrath, Plaintiff reported "mild improvement" in her neck and back pain. Dr. McIlrath continued to note mild spasms. On May 2, 2002, Dr. McIlrath completed a second "Disability Certificate" for Plaintiff dated May 28, 2002, stating that she was "totally incapacitated" from May 1, 2002 through May 21, 2002. (Tr. 153).

In late May, Dr. McIlrath also wrote to Plaintiff's insurance company and reported that Plaintiff had pain with bending and tenderness over the site where her rib was healing, but a normal neurological examination of the upper extremities, full range of motion of the thoracolumbar region, except for the

5

forward flexion, no acute spasms, negative orthopedic tests for nerve root encroachment and normal muscle strength. Dr. McIlrath recommended that Plaintiff continue with treatment at a rate of 3 times per week for four weeks and then two times per week after that. (Tr. 149). Dr. McIlrath completed a third "Disability Certificate" for Plaintiff on May 28, 2002, indicating that she was "totally incapacitated" from May 21, 2002 until June 17, 2002. (Tr. 150).

Plaintiff also returned to Dr. Tiffany twice in May complaining of cervical pain and spasm, thoracic pain and spasm and lower back pain. On examination, Dr. Tiffany found that Plaintiff had normal range of motion in her thoracic and lumbar spine, no tenderness or spasm, and a normal straight leg raise. (Tr. 316). Dr. Tiffany also found that Plaintiff had normal range of motion in her neck and shoulders with no tenderness or spasm. (Tr. 318, 320).

In mid-June 2002, Plaintiff underwent an MRI of the thoracic spine which revealed no focal extradural defects. However, the MRI showed a fatty endplate change involving the mid thoracic spine with minimal hypertrophic spurring seen anteriorly. (Tr. 144). An MRI of the cervical spine revealed "minimal spondylitic riding to the left at the C5-C6 level where more focal osteoarthritis is present involving the left uncovertebral joint, resulting in mild to moderate left neural foraminal stenosis."

(Tr. 145). The MRI also showed a "disc bulge at the C6-C7 level without mass effect." (Tr. 145). On June 24, 2002, Dr. McIlrath completed a fourth "Disability Certificate" for Plaintiff indicating that she was totally incapacitated from June 18, 2002 until July 1, 2002. (Tr. 141).

In mid-July, Dr. McIlrath referred Plaintiff to Kishor Patil, M.D., a neurologist. (Tr. 215-217). Upon examination of Plaintiff, Dr. Patil noted tenderness and spasm of paraspinal muscles of the cervical, thoracic and lumbar spine. Dr. Patil noted a 35 percent reduction in range of motion with flexion, extension and lateral rotations of the thoracic, cervical spine. Dr. Patil also noted a 25 percent reduction in the range of motion with flexion, extension and lateral rotations of the lumbar spine. Dr. Patil stated that Plaintiff "clearly remains extremely symptomatic from the injuries sustained in the motor vehicle accident." (Tr. 217). Dr. Patil diagnosed Plaintiff with post-traumatic rib fracture, post traumatic cervical, thoracic and lower back sprain/strain, post traumatic cervical radiculopathy and cervicogenic headaches and prescribed Soma and Vioxx to break the spasm/pain cycle. (Tr. 217).

Plaintiff reported to Dr. Patil on August 14, 2002, for a follow-up visit. During this visit, Dr. Patil administered EMG and nerve root conduction studies on Plaintiff's upper extremities. The test results were consistent with a left C5-C6

7

radiculopathy. (Tr. 211). Dr. Patil prescribed Pamelor.

About two weeks later, Plaintiff reported back to Dr. Patil. He discontinued the Pamelor, because she had "very unusual side effects." As a result of her symptoms, Dr. Patil performed an EMG and nerve conduction study on Plaintiff's lower extremities; however, the results of those tests were normal. (Tr. 207, 208). Because of the severity of her symptoms, Dr. Patil opined that Plaintiff would not be able to return to work. Dr. Patil also prescribed Neurotonin. (Tr. 208).

In September 2002, Plaintiff returned to Dr. Patil and reported that her pain level had "somewhat diminished in intensity" since starting the Neurotonin. Plaintiff also reported dizziness associated with her medication. Dr. Patil noted that some dizziness associated with Neurotonin was possible, but hoped that Plaintiff would begin to develop a tolerance to it. (Tr. 206).

Plaintiff also continued to treat with Dr. McIlrath throughout September 2002. On September 6, 2002, Dr. McIlrath reported to Plaintiff's insurance company that she experienced "pain everyday with significant relief through her treatments at this office for the neck and upper back." (Tr. 133). Dr. McIlrath noted that Plaintiff continued to suffer from "chronic, several spinal trauma injuries." (Tr. 134). He recommended continued treatment 2-3 times per week for six weeks. During

8

some of her treatment visits Plaintiff reported mild improvements in her condition. By early October 2002, Dr. McIlrath noted that Plaintiff still experienced pain, but her symptoms had decreased and were less frequent. (Tr. 129).

In late October 2002, Plaintiff returned to Dr. Patil. He noted that Plaintiff's pain level and headache frequence had decreased, but that Plaintiff remained "quite uncomfortable." Dr. Patil added Elavil to Plaintiff's medications to help her sleep. (Tr. 205).

On October 25, 2002, Plaintiff's insurance company required her to undergo an independent medical examination by John T. Hogan, M.D. Dr. Hogan noted that Plaintiff "continues to have significant pain." (Tr. 117-120). Plaintiff reported that the beneficial results of her chiropractic treatment lasted for an hour or maybe up to 24 hours, with her amount of discomfort waxing and waning. Upon examination, Dr. Hogan found that Plaintiff had approximately two-thirds range of flexion/extension and left and right rotation of her cervical spine and about one-third the normal level of right and left lateral flexion. Plaintiff had tenderness in the cervical spine and the right trapezius, but none in the shoulders and both arms had good range of motion. Plaintiff had normal grip strength and was able to walk on her toes, but not her heels because it caused too much back pain. Dr. Hogan diagnosed Plaintiff with "persistent fairly

9

significant symptoms in the cervical and dorsal spine and to a lesser extent the lumbosacral spine." (Tr. 119). Dr. Hogan opined that Plaintiff's chiropractic treatment had "really produced no benefit after the first few months" and opined that "this modality of treatment is of questionable value at this time." (Tr. 119). Because there were no objective signs of neurological deficit, Dr. Hogan felt there was no indication for surgery. Dr. Hogan opined that Plaintiff "is certainly not able to go back to work in the post office," and further stated that he could not "foresee when, if ever, she will be improved enough to resume this job." (Tr. 119-120). He described her prognosis for a meaningful recovery as "gloomy." (Tr. 120).

Throughout November, Plaintiff continued to treat with Dr. McIlrath and complained of neck pain and headaches with stiffness and difficulty rotating the head and neck. (Tr. 124). Plaintiff also continued to treat with Dr. Patil monthly. By January 2003, Dr. Patil stated that Plaintiff "remains functionally impaired" and noted that she "has difficulty with almost all activities of daily living including bending, pushing, turning and twisting." (Tr. 203). At this time, Dr. Patil also prescribed Ultram.

On February 13, 2002, Dr. McIlrath wrote a "To Whom It May Concern" letter opining that Plaintiff "sustained permanent injuries" as a result of her motor vehicle accident and that she was "unable to return to work in any capacity." (Tr. 268). Dr.

10

McIlrath opined that Plaintiff would not be able to return to
work in a position requiring repetitive bending or kneeling,
lifting of greater than ten pounds more than two times in a four
hour period or pushing greater than 20 pounds more than three
times in a four hour period.

On February 18, 2003, Plaintiff underwent an MRI of the
lumbar spine which showed disc bulging, most apparent at the L4-
L5 level, without as effect.  Mild osteoarthritis was also seen
at this level.  (Tr. 123).

On February 19, 2003, Dr. Patil also wrote a "To Whom It May
Concern" letter in which he opined that Plaintiff suffered from
cervical and lumbar sprain/strain, cervical radiculopathy and
chronic pain.  Dr. Patil also opined that Plaintiff could not
fulfill the job duties delineated in her job description.  (Tr.
202).  Dr. Patil based his opinions on Plaintiff's August 2002
EMG and her June 2002 MRIs.  The following day, Dr. Patil wrote
to Dr. McIlrath and indicated that he was running out of
treatment options for Plaintiff.

On March 15, 2003, Dr. McIlrath completed a fifth
"Disability Certificate" for Plaintiff.  In this Certificate, Dr.
McIlrath opined that Plaintiff was permanently incapacitated and
that her injuries were permanent, precluding her from returning
to work in her previous or any similar position, indefinitely.
(Tr. 265).

11

Plaintiff continued to treat with Dr. McIlrath through April 2003. At some of these treatments, Dr. McIlrath noted that treatment was helping Plaintiff, but at other visits, she continued to complain of pain. (Tr. 256-263).

By May 2003, Plaintiff continued to report tremendous amounts of pain to Dr. Patil. Dr. Patil noted that Plaintiff was allergic to many narcotic medications, but prescribed a Fentanyl patch to try. (Tr. 199). Plaintiff suffered a severe adverse reaction to the patch and had to discontinue its use. (Tr. 242). Dr. Patil indicated that he had no more treatment options to offer Plaintiff, but would continue the Neurontin "since [it] does work." (Tr. 242). Dr. Patil also opined that Plaintiff remained impaired and disabled due to her injuries.

In late July 2003, Plaintiff was again evaluated by Dr. Hogan at the request of Plaintiff's insurance company. Dr. Hogan reported that Plaintiff had no significant changes since her last examination. Plaintiff reported to Dr. Hogan that she cannot do any ironing or real vacuum cleaning, but that she could dust, do some cooking and use a small light rechargeable electric broom. Plaintiff told Dr. Hogan she could only stand for about 15 minutes and walk for 30 minutes. Dr. Hogan's physical examination of Plaintiff was essentially the same as his previous exam. Dr. Hogan opined that Plaintiff reached maximum medical improvement and that "there is no job in the mainstream of life,

12

that I can think of, that she could possibly do with the limitations she has." (Tr. 246). Because of her allergies to opiates, Dr. Hogan could not think of many other treatment options for Plaintiff. Dr. Hogan believed Plaintiff's chiropractic treatment was "not worth it," and the most he could suggest was a specialist in pain control. To this effect, Dr. Hogan stated, "I am afraid that this lady is going to be stuck with the present condition for the foreseeable future." (Tr. 247).

On August 29, 2003, Dr. McIlrath reviewed Dr. Hogan's examination and wrote to Plaintiff's attorney. Dr. McIlrath was offended by Dr. Hogan's opinion that Plaintiff's chiropractic treatments were not worth it. However, Dr. McIlrath agreed with Dr. Hogan that Plaintiff could not return to her job at the post office. (Tr. 254-255).

On October 7, 2003, Plaintiff consulted with Frederick W. Gooding, M.D. for pain management. Dr. Gooding noted that Plaintiff was grossly obese. Dr. Gooding also noted that Plaintiff had decreased range of motion, approximately 25 percent, in all directions secondary to pain. Dr. Gooding felt that Plaintiff was a good candidate for interventional pain management, beginning with nerve blocks in the cervical region. (Tr. 274-275). Six days later, Dr. Gooding noted that Plaintiff had a poor response to the initial injection.

13

On October 29, 2003, Plaintiff underwent another MRI which revealed mild spondylosis and mild spurring particularly on the C5-C6 level. Plaintiff's MRI showed no disc herniation and no root impingement or cord compression. (Tr. 278).

By mid-December 2003, Dr. Gooding noted that Plaintiff did not find the trigger point injections to be helpful to relieve her pain. Plaintiff was reluctant to receive additional injections, so she was given a prescription to have a trial of epidural blocks.

In January 2004, Plaintiff was referred by Dr. Gooding to Jessica W. Jerrard, D.O., a pain specialist. Plaintiff reported pain in the back of her head and neck which caused her frequent headaches. Dr. Jerrard described Plaintiff as moderately obese weighing 240 pounds with a height of 5'3". Dr. Jerrard diagnosed Plaintiff with cervical and lumbar myofascial deconditioning and a component of radiculitis and suggested physical therapy, including soft tissue massage, heat and traction and the use of ultrasound. Dr. Jerrard also prescribed Zanaflex. (Tr. 341-343).

Plaintiff was next seen by Dr. Patil on February 12, 2004. At this time, Dr. Patil noted that Plaintiff suffered an increased pain level. (Tr. 356). Dr. Patil opined "with a reasonable degree of medical probability that [Plaintiff's] injuries will be permanent . . . [and] she will not be able to

14

hold down gainful employment." (Tr. 356). Dr. Patil then released Plaintiff back to Dr. McIlrath's care, with the understanding that he could see Plaintiff on an as-needed basis.

On March 4, 2004, Dr. Patil completed a residual functional capacity form for Plaintiff. (Tr. 354-355). Dr. Patil opined that Plaintiff could not lift any weight in an 8 hour work day on even an occassional basis. Dr. Patil left blank the portion of the form assessing Plaintiff's ability to stand and walk, but opined that she could sit for one to two hours in an 8 hour work day. Dr. Patil also opined that Plaintiff suffered from pain more than 20 days per month and would not be able to perform the full range of light work for forty hours per week, because of chronic pain, muscle spasms and cervical radiculopathy. Dr. Patil also opined that Plaintiff could not perform the full range of sedentary work for forty hours per week, "[b]ecause of her injuries." (Tr. 354). Dr. Patil based his findings on Plaintiff's EMG and MRIs.

Between the time of her injuries and the A.L.J.'s decision, Plaintiff's condition was assessed by three state agency physicians. One physician performed a consultative examination and two reviewed the medical evidence in the record.

On March 18, 2003, Plaintiff underwent a consultative examination with Irwin Lifrak, M.D. for Disability Determination Service. Plaintiff reported to Dr. Lifrak that she experienced

15

pain throughout her entire vertebral column extending through both her arms and her legs. She estimated that she could sit for an hour and stand for an hour and that she could only lift five pounds with either hand. Upon examination, Dr. Lifrak noted that Plaintiff was able to get on and off the examining table without assistance and perform maneuvers with her hands that required dexterity. Plaintiff was unable to walk on either her heels or her toes. Plaintiff's grip strength was 5/5 and she had 5/5 muscle tone in the lower extremities. Dr. Lifrak noted a reduced range of motion in Plaintiff's lumbosacral spine and cervical spine, but no evidence of paravertebral muscle spasms. Dr. Lifrak diagnosed Plaintiff with degenerative joint disease and possible disc damage, which he opined would account for her complaints of pain and reduced range of motion. Nevertheless, Dr. Lifrak further opined that during an 8-hour day with usual and customary breaks, Plaintiff would be able to climb stairs, sit for 6 hours, stand for 6 hours and lift up to ten pounds regularly. (Tr. 179-182).

In the Spring of 2003, two state agency physicians reviewed Plaintiff's medical records. Both concluded that Plaintiff retained the capacity to lift twenty pounds occasionally and ten pounds frequently. (Tr. 185-192, 218-225). One state agency physician opined that she could stand or walk 6 hours in an eight hour work day (Tr. 186), and the other opined that she could

16

stand or walk at least 2 hours in an eight hour work day. Both
state agency physicians found that Plaintiff could sit about 6
hours in an eight hour work day, and both opined that she could
occasionally engage in postural movements such as kneeling,
stooping, crouching or crawling.

B.    The A.L.J.'s Decision

On March 10, 2004, the A.L.J. conducted a hearing on
Plaintiff's application for benefits. At the hearing, Plaintiff
was represented by counsel. Plaintiff testified that she took
Neurontin and Baclofen for pain and that the medications helped
"some." (Tr. 363). Plaintiff testified that she could lift a
gallon of milk (weighing about eight pounds) and could walk on
level ground or stand comfortably for five to ten minutes.
Plaintiff testified that she "sometimes" did cooking, housework
and shopping and that she was "sometimes" able to go out and
visit people. Plaintiff indicated that she spent time reading
and was able to take care of her personal needs, but that she
sometimes needed help with her hair from her daughter. (Tr. 365-
366). Overall, Plaintiff testified that she experienced good and
bad days, and that her activity level depended on the type of day
she was having. On bad days, Plaintiff testified that she could
not do anything and that she didn't take a shower or get dressed
on those days. Plaintiff testified that she had bad days 12 to
15 days per month. (Tr. 366-370).

In addition to Plaintiff, a vocational expert testified. The vocational expert testified that Plaintiff's past work as a post office clerk was semi-skilled light work as performed, but heavy as Plaintiff described it. The vocational expert also indicated that Plaintiff possessed clerical and money-handling skills that would be transferable to other types of clerical work in the sedentary and light levels. The A.L.J. asked the vocational expert to assume a younger individual with a limited education and an RFC for sedentary work with semi-skilled experience and the following non-exertional impairments: headaches and pain in the neck, mid-low back, arms, legs, hands, shoulders and hips, with some anxiety and depression and some dizziness and memory difficulty due to medication. The A.L.J. also asked the vocational expert to assume that these symptoms were mild to moderate in nature. In response, the vocational expert testified that the hypothetical person referred to in the A.L.J.'s job description could not perform any of the jobs listed in the regulations if the individual would regularly miss one and a quarter days of work per month. However, if the individual could report to work regularly and complete a normal eight-hour day, such an individual could perform entry level sedentary occupations like (1) cashier for which there are approximately 1,600 positions in Delaware and 602,000 in the nation economy; (2) telephone solicitor or telephone order clerk for which there

18

are 380 positions in Delaware and 157,000 in the national economy; and (3) records clerk for which there are 300 positions in Delaware and 114,000 in the national economy.

In his decision dated April 6, 2006, the A.L.J. found that Plaintiff suffered from degenerative joint disease and possible disc damage of the cerival spine, lumbar spine and thoracic spine and obesity which are "severe" impairment, but impairments that did not meet or equal one of the listed impairments in 20 C.F.R. pt. 404, subpt. P. app. 1 (2003).  (Tr. 21).  The A.L.J. further found that Plaintiff was not fully credible and that she retained the residual functional capacity to stand/walk up to two hours in an eight hour day, sit up to six hours in an eight hour day, and lift up to ten pounds.  The A.L.J. also concluded that Plaintiff was limited nonexertionally in that she could only perform simple, routine tasks that do not require concentration and she cannot work around vibrations or hazards like unprotected heights and dangerous machinery.  As a result, the A.L.J. found that plaintiff could perform a significant range of sedentary work, but not the full range.  Using Medical Vocational Rule 201.26 as a framework for decision making, the A.L.J. concluded that Plaintiff could perform a significant number of jobs in the national economy, and therefore, she was not disabled within the meaning of the Act.

19

## STANDARD OF REVIEW

Findings of fact made by the Commissioner of Social Security are conclusive, if they are supported by substantial evidence. Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision. Monsour Medical Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. Id. In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence. Id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. As the United States Supreme Court has noted substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 555 (1988).

With regard to the Supreme Court's definition of "substantial evidence," the Court of Appeals for the Third Circuit has further instructed that "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores or fails to resolve a conflict created by countervailing

evidence. Nor is evidence substantial if it is overwhelmed by other evidence . . . or if it really constitutes not evidence but mere conclusion." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the substantial evidence standard embraces a qualitative review of the evidence, and not merely a quantitative approach. Id.; Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

## DISCUSSION

### I.    Evaluation Of Disability Claims

Within the meaning of social security law, a "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." 20 C.F.R. § 404.1505. In order to qualify for disability insurance benefits, the claimant must establish that he or she was disabled prior to the date he or she was last insured. 20 C.F.R. § 404.131, Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990). The claimant bears the initial burden of proving disability. 20 C.F.R. § 404.1512(a); Podeworthy v.

21

Harris, 745 F.2d 210, 217 (3d Cir. 1984).

In determining whether a person is disabled, the Regulations require the A.L.J. to perform a sequential five-step analysis. 20 C.F.R. § 404.1520. In step one, the A.L.J. must determine whether the claimant is currently engaged in substantial gainful activity. In step two, the A.L.J. must determine whether the claimant is suffering from a severe impairment. If the claimant fails to show that his or her impairment is severe, he or she is ineligible for benefits. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).

If the claimant's impairment is severe, the A.L.J. proceeds to step three. In step three, the A.L.J. must compare the medical evidence of the claimant's impairment with a list of impairments presumed severe enough to preclude any substantial gainful work. Id. at 428. If the claimant's impairment meets or equals a listed impairment, the claimant is considered disabled. If the claimant's impairment does not meet or equal a listed impairment, the A.L.J.'s analysis proceeds to steps four and five. Id.

In step four, the A.L.J. is required to consider whether the claimant retains the residual functional capacity to perform his or her past relevant work. Id. The claimant bears the burden of establishing that he or she cannot return to his or her past relevant work. Id.

22

In step five, the A.L.J. must consider whether the claimant is capable of performing any other available work in the national economy. At this stage the burden of production shifts to the Commissioner, who must show that the claimant is capable of performing other work if the claimant's disability claim is to be denied. Id. Specifically, the A.L.J. must find that there are other jobs existing in significant numbers in the national economy, which the claimant can perform consistent with the claimant's medical impairments, age, education, past work experience and residual functional capacity. Id. In making this determination, the A.L.J. must analyze the cumulative effect of all of the claimant's impairments. At this step, the A.L.J. often seeks the assistance of a vocational expert. Id. at 428.

## II. Whether The A.L.J.'s Decision Is Supported By Substantial Evidence

By her Motion, Plaintiff contends that the A.L.J.'s decision is not supported by substantial evidence. Specifically, Plaintiff contends that the A.L.J. erred in (1) failing to properly evaluate the medical opinions in the record, including the opinions of Dr. McIlrath, Dr. Patil and Dr. Hogan; (2) determining that Plaintiff was not credible and failing to properly assess her subjective complaints in light of this credibility determination; and (3) failing to provide the vocational expert with a hypothetical question that included all of Plaintiff's limitations.

After reviewing Plaintiff's arguments in the context of the A.L.J.'s decision, the Court concludes that a remand of this matter is necessary to allow the A.L.J. to address certain deficiencies in his decision. Although the A.L.J. considered Dr. Hogan to be a treating physician, he did not explain the weight to be afforded to his opinion. Absent such an explanation, it is difficult for the Court to review how the A.L.J. assessed Dr. Hogan's opinions. Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).

In addition, the A.L.J. specifically found in his decision that Plaintiff was non-exertionally limited to "perform[ing] simple, routine tasks that do not require sustained concentration." (Tr. 21). However, the A.L.J. failed to include this limitation in his hypothetical question to the vocational expert (Tr. 373), and therefore, the vocational expert's response cannot be considered substantial evidence supporting the A.L.J.'s decision. Burns v. Barnhart, 312 F.3d 113, 123 (3d Cir. 2002); Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). Accordingly, the Court will remand this matter to the A.L.J. for further findings and/or proceedings consistent with this decision.

## CONCLUSION

For the reasons discussed, Defendant's Motion For Summary Judgment will be denied, and Plaintiff's Motion For Summary

24

Judgment will be granted.   The decision of the Commissioner dated April 6, 2004, will be reversed, and this case will be remanded to the A.L.J. for further findings and/or proceedings consistent with this Memorandum Opinion.

An appropriate Order will be entered.

25